UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

MARY FOULKE and JACK YOUNG, JR.,
As Personal Representatives for the Estate of
John C. Young,
    Plaintiffs,

v.                                            Case No.: 3:20cv5506/MCR/EMT

DANIEL WELLER, et al,
    Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is before me on referral from the District Judge for preparation of a Report and Recommendation regarding Plaintiffs' Motion in Limine for Evidentiary Sanctions Due to Defendants' Spoliation of Evidence and Memorandum of Law in Support Thereof (ECF No. 35). Defendants responded in opposition to the motion (*see* ECF Nos. 42, 43). For the reasons set forth below, I recommend the motion be denied.

I.    Factual Background

This case stems from a fatal officer-involved shooting. Plaintiffs, Mary A. Foulke and Jack Young, Jr., brought the action as personal representatives of the estate of the decedent, John C. Young, naming as Defendants Chip W. Simmons, Escambia County Sheriff, and five deputies of the Escambia County Sheriff's Office (ECSO)—Daniel Weller, Joshua Lavoie, Luke 3McCracken, James Barnes, and

Jacob Holloway. The facts regarding the incident that took Mr. Young's life are disputed. The facts serving as the basis of this motion, however, generally are not disputed, although inferences derived from those facts, and application of the law to the facts and inferences, are disputed. As recited herein, the facts are drawn from the motion and exhibits, as well as from Defendants' response and exhibits (*see* ECF Nos. 35, 42, 43).

During the predawn hours of December 1, 2018, Young called 911 from his location at the Alabaster Garden Apartments in Escambia County to report he had "just murdered someone" (ECF No. 42-1, p. 3).[1] Within minutes, deputies began arriving at the scene. Several deputies encountered Young at the door of Young's apartment. What happened next is sharply disputed by Plaintiffs.

According to the recorded statement of Defendant Holloway, provided to the Florida Department of Law Enforcement (FDLE), when Young opened the door, Holloway saw "the end of a meat cleaver in the doorway" (ECF No. 42-3, p. 13). Holloway, and perhaps other deputies, ordered Young to "drop the knife" (ECF No. 42-3, p.14). When Young stepped out of the apartment, he was holding "a yellow-handled box knife type thing in his left hand, and the meat cleaver . . . in his right

---

[1] The page numbers cited in this Report and Recommendation refer to those assigned by the court's electronic docketing system.

hand" (ECF No. 42-3, p. 15). Deputies "continually" commanded Young to "drop the knife" (ECF No. 42-3, p. 17). When the knife—or knives—were not dropped, Defendant Weller began firing a non-lethal bean bag gun at Young (*id.*). Deputy Weller fired several bags, impacting Young in the upper torso (ECF No. 42-3, pp. 17–19).

Although rounds hit Young several times, Young did not drop the weapon and, instead, "raise[d] up the meat cleaver . . . like he[ was] gonna throw it" (ECF No. 42-3, p. 18–20). Holloway then, according to his statement, "opened fire with [his] Sig" (ECF No. 42-3, p. 20). Deputies Weller and Lavoie also fired (ECF No. 42-3, pp. 18–20).

According to Defendant Weller, deputies struck Young not only with bean bags but also with a Taser (ECF No. 42-4, p. 3). Neither had any effect on Young (ECF No. 42-4, pp. 2–3). Weller recalled that as he drew his service weapon, he saw "the knife flying . . . flying at [him]" (ECF 42-4, p. 4). Weller also recalled other deputies firing at Young "while the knife [was] in the air" (*id.*). According to Weller, the knife "hit[] [his] leg somewhere" before he pointed his gun at Young (*id.*). After he was hit, Weller "squared up with the guy, and placed rounds on him" (*id.*). In all, deputies inflicted thirty-nine bullet wounds on Young, resulting in Young's death. (ECF No. 42-8, p. 4).

Weller stated that after the incident, he looked at his pants because he knew the knife hit him somewhere on his leg but was not sure of where (ECF No. 35-1, pp. 6–7). He saw a hole "about midway between [his] knee and [his] thigh" (ECF No. 35-1, p. 7). He pulled his pants up and saw "like a little red mark" but no "bleeding or anything" (*id.*). Later, while at the ECSO, Weller went to the restroom to take another look (*id.*). He pulled his pants down and noticed not only a red mark but also "another hole just above it, as well, so kind of a bigger slit and then a smaller one" (ECF No. 35-1, pp. 7–8). He then pulled his cell phone out of his left pocket and noticed a two or three inch scrape across the backside of the Otter Box case, which "kind of matche[d] up with the hole . . . in [his] pants" (ECF No. 35-1, pp. 8–9).

The ECSO notified FDLE of the officer-involved shooting (ECF No. 42-8, p. 1). Shortly thereafter, FDLE began its investigation. FDLE Agent White asked Agent Wilkerson to "take photographs of the officers, the officer's torn pants, and the damaged cell phone" (ECF No. 42-8, p. 1). The pants and cell phone case, however, were not collected by the ECSO or FDLE (ECF No. 42-31, p. 1). Deputy Weller continued to use the phone, with the Otter Box case, and wear the uniform pants that allegedly were damaged during the incident (ECF No. 35-1, pp. 18–22).

On February 15, 2021, twenty-six to twenty-seven months after the shooting, Plaintiff's counsel requested production of the uniform pants, cell phone, and Otter

Box case. On February 23, 2021, the ECSO collected the items and placed them into evidence (ECF No. 42-34, pp. 1–3). Counsel for Plaintiffs inspected and photographed the pants and cell phone case several weeks later (ECF No. 42-35).

II.     Contentions of the Parties

Plaintiffs, noting Defendants are the only surviving witnesses to the incident, assert the items in dispute are the only physical evidence by which the deputies' claims of self-defense can be supported or defeated. In Plaintiffs' view, arrival of FDLE at the scene, for the purpose of conducting an investigation of an officer-involved fatal shooting, as well as the ECSO's internal investigation, triggered a duty to preserve the items. The duty was enhanced, say Plaintiffs, because Defendants are law enforcement officers and thus are sophisticated in terms of collection and preservation of evidence.

Further, Plaintiffs contend, they have no way to determine that the pants and cell phone case are in the same condition as they were on December 1, 2018. Plaintiffs note that, through counsel, they sent the ECSO a preservation notice "requesting that your department preserve all physical evidence" relevant to the incident of December 1, 2018 (ECF No. 35-1, pp. 23–25). The notice delineated specific "additional evidence," which enumeration did not include reference to the pants or cell phone case. The notice did, however, instruct the ECSO "not to destroy,

erase, encrypt, alter, or otherwise make unavailable any electronic data and/or evidence relevant to the incident . . . ." (ECF No. 35-1, p. 24).

Noting Weller discovered the gouges in the cell phone case hours after the incident, and while alone in a restroom, Plaintiffs assert not only that they cannot accurately know the condition of the items as of the time of the fatality but also that they have no way to determine "that the items submitted to ECSO custody on February 23, 2021, are the same items that were photographed on or about December 1, 2018" (ECF No. 35, p. 7).

Plaintiffs also identify an internal ECSO order having the stated purpose of providing procedures "for processing crime scenes, handling, collecting, and processing evidence," which provides, in part:

> "The crime scene must be protected from entry by unnecessary or unauthorized persons so that physical evidence will not be disturbed, altered, moved, destroyed, lost, or contaminated.
>
> * * *
>
> Evidence collection: a) documentation, photographing, and/or video recording will be completed prior to collecting any physical evidence."

(ECF No. 35-1, pp. 27–28).

Given that the place of the shooting was a potential crime scene, and that the deputies were law enforcement personnel routinely engaged in criminal and homicide investigations, Plaintiffs urge the deputies were aware of their obligation to preserve the crime scene, including physical evidence. Thus, say Plaintiffs, the

failure of Weller and the ECSO to immediately secure and preserve the items in question rises to the level of spoliation of evidence, and appropriate sanctions are due.

Not surprisingly, Defendants take a different view. The investigation was the responsibility of FDLE, agents of which ordered photographs of Weller's pants, cell phone, and cell phone case. The FDLE investigator determined the photos would be sufficient for purposes of the investigation. Defendants say Plaintiffs are merely disagreeing with the methodology of the FDLE investigation.

Moreover, say Defendants, no spoliation, in the sense of alteration or destruction, can be shown. Weller testified that although he kept the items, he only wore and washed the pants a handful of times (ECF No. 42-37, pp. 1–4). He continued to use the cell phone and cell phone case until sometime in 2019, and the items remained in his possession until he turned them over to the ECSO in 2021 (ECF No. 42-37, pp. 4, 8). Weller confirmed the items turned over to the ECSO in fact were the same items he was using on December 1, 2018 (ECF No. 35-1, pp. 18–22). The only change to the items, according to Weller, was removal of a Velcro strip from the cell phone case (ECF No. 42-37, pp. 5–6). In their memorandum, Defendants argue that, considering the meat cleaver and Weller's uniform pants, cell phone, and cellphone case are currently located at the ECSO, the items are still

available for forensic inspection and analysis, and Plaintiffs thus have failed to establish that spoliation occurred (ECF No. 43, p. 18).

III.   Law and Analysis

For the purpose of considering the propriety of sanctions, spoliation is "the 'destruction' of evidence or the 'significant and meaningful alteration of a document or instrument.'" *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003) (quoting *Aldrich v. Roche Biomedical Labs., Inc.*, 737 So. 2d 1124, 1125 (Fla. 1st DCA 2003) (internal marks omitted)).  Spoliation also includes the intentional concealment of evidence. *See Walter v. Carnival Corp.*, No. 09–20962–CIV, 2010 WL 2927962, at *2 (S.D. Fla. July 23, 2010) (citing *St. Cyr v. Flying J Inc.*, No. 3:06–cv–13–33TEM, 2007 WL 1716365, at *3 (M.D. Fla. June 12, 2007)); *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1322 (S.D. Fla. 2010).  "To establish spoliation, the party seeking sanctions must prove several things; first, that the missing evidence existed at one time; second, that the alleged spoliator had a duty to preserve the evidence; and third, that the evidence was crucial to the movant being able to prove its prima facie case or defense." *Walter*, 2010 WL 2927962, at *2 (citing *Floeter v. City of Orlando*, 2007 WL 486633, at *5 (M.D. Fla. Feb.9, 2007)); *see also In Matter of Complaint of Boston Boat III, L.L.C.*, 310 F.R.D. 510, 514 (S.D. Fla. 2015).

Here, the pants, cell phone, and cell phone case indisputably existed at one time (and, Defendants posit, still do). Plaintiffs therefore have satisfied the first element of a spoliation claim. The second element—duty to preserve—arises once litigation is pending or reasonably foreseeable. *See Graff v. Baja Marine Corp,* 310 F. App'x 298, 301 (11th Cir. 2009). I have no difficulty concluding the duty to preserve arose at the time of the FDLE investigation, irrespective of any claim the photographs were enough. *Cf. Reynes v. Paradise Cruise Line Operator Ltd., Inc.*, No. 20-61474-CIV-Cannon/Hunt, 2021 WL 2905503, at *3 (S.D. Fla. June 10, 2021) (noting in case in which there were two videos, one of which was destroyed, that "there [was] nothing to indicate that the second video showed more than the first" and that "were this to become an issue at trial, Plaintiff would be well within her rights to ask the Court to address any attempt by Defendant to gain some advantage from the absence of the erased video" and that Plaintiff had "access to a video that depict[ed] the incident in question" but nevertheless made "a credible claim that her case would be significantly stronger if her expert were able to examine the actual flooring"). Of course, Plaintiff sent the preservation letter just days after the incident. I am not persuaded by Defendants' argument that FDLE was calling the shots, and thus ECSO had no separate duty to preserve the items in question.

The next question, then, becomes whether the items, as they existed on December 1, 2018, are crucial to Plaintiffs' claims or defenses. The posture of this

case moves the question into a somewhat subtle area—Plaintiffs contend the items in their original condition, although not strictly part of the case in chief, are nonetheless crucial to their ability to defeat Defendants' claims of self-defense. As Plaintiffs recognize, a successful showing of self-defense would defeat the cause of action for excessive force.

Caselaw provides guidance as to the meaning of "crucial" evidence. "[I]t is not enough for the movant to show only that the spoliated evidence would have been *relevant* to a claim or defense." *Boston Boat*, 310 F.R.D at 514 (emphasis in original); *see also Managed Care Solutions*, 736 F. Supp. 2d at 1327–28 (finding the allegedly spoliated evidence was not crucial to plaintiff's claims because plaintiff could still prove its case through other evidence already obtained); *Floeter*, 2007 WL 486633 at *6 (finding missing emails were not crucial to plaintiff's case).

Acknowledging Plaintiffs' claim that analysis of the items, and comparison of indentations left by the meat cleaver, would be helpful, I come just short of concluding the items (as they existed on December 1, 2018) are crucial to Plaintiffs' case in chief. Plaintiffs may question the credibility of the officers in other ways, such as exploiting differences in the versions of events as related by the officers to FDLE. Plaintiffs also may point out that Deputy Weller purportedly did not discover the gouges in the cell phone case until several hours after the incident, and at a time and place where he was alone, with no other witness to corroborate the discovery.

Moreover, and as repeatedly emphasized by the defense, contemporaneous photos of the items exist, as do, say Defendants, the items themselves.

Plaintiffs retained a forensic expert, Kris Sperry, M.D. (ECF 35-1, pp. 110–18). Dr. Sperry observed, with regard to the items allegedly spoliated, that "[t]he actual meat cleaver has never been subjected to forensic testing that would assess the edge sharpness of the blade, and any forensic comparison of the cleaver and the defects in the pants is now impossible, as the pants have been laundered multiple times, thus irrevocably altering the characteristics of the incised defects" (ECF No. 35-1, p. 117).[2] This statement, even if taken at face value, does not clarify why some testing of the hard items—the cell phone and case, as well as the meat cleaver—cannot now be accomplished. Nor does it explain why a few washings of the pants would render totally futile an attempt to compare the cleaver blade with the fabric. Nevertheless, this being a Report and Recommendation, and for purposes of full analysis, I will proceed assuming the third prong of the spoliation test has been met.

"In addition to [the three prongs of the threshold spoliation test], sanctions for spoliation are appropriate only when there is evidence of bad faith." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). While malice is not

---

[2] Dr. Sperry's opinions with regard to damage to the pants, cell phone, and cell phone case have been challenged by Defendants, who note that Dr. Sperry is not a tool mark expert, having admitted as much in his deposition (*see* ECF No. 55, p. 10).

required to show bad faith, mere negligence in losing or destroying evidence is not enough to impose spoliation sanctions. *Mann v. Taser Intern., Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009); *see Flury*, 427 F.3d at 946; *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (determining a party's failure to preserve evidence rises to the level of sanctionable spoliation "only when the absence of that evidence is predicated on bad faith," such as where a party purposely loses or destroys relevant evidence). In other words, "[s]poliation sanctions—and in particular adverse inferences—cannot be imposed for negligently losing or destroying evidence." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020). "[B]ad faith, 'in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence.'" *Id.* (citing *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015)).

I have found that, as to the duty to preserve, ECSO cannot rely entirely upon the decision of the FDLE investigator to photograph and release the items at issue. Nevertheless, such action by the official investigating agency strongly militates against a finding of bad faith, as needed to support spoliation sanctions. And I cannot overlook the complete lack of evidence—or factual matters sufficient to support an inference—that Deputy Weller, in fact, altered, or allowed to be altered, in significant fashion, the items in question. *Cf. Flury,* 427 F.3d at 941–42 (noting counsel ignored defendant's request for location of accident vehicle—which, without notice to defendant, was removed and sold for salvage—before defendant

had any opportunity to see or inspect vehicle); *Oil Equip. Co. Inc. v. Modern Welding Co. Inc.*, 661 F. App'x 646, 650 (11th Cir. 2016) ("OEC transported the [allegedly defective] tank to an OEC employee's land, where it was stored in an open field. OEC took no steps to preserve the integrity of the tank, and OEC did not notify Modern Welding of the tank's removal or its location. The tank was left exposed to the elements for over a year before OEC filed [suit]."); *Boston Boat*, 310 F.R.D. at 512 ("Before [plaintiff's] expert had the opportunity to inspect the vessel, and approximately one year after the litigation began, Boston Boat ripped out all the carpeting on the upper deck, ground down the deck under the carpet and generally changed the upper-level of the [accident vessel].").

I have not ignored the rule that if direct evidence of bad faith is unavailable, the moving party may establish bad faith through circumstantial evidence. *Id.* at 516. The test for circumstantial evidence of bad faith is as follows:

> (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

*Managed Care Sols.*, 736 F. Supp. 2d at 1323. The party seeking sanctions must establish all four of these factors where there is no direct evidence of bad faith. *Id.*

Here, although the case for carelessness may be strong, Plaintiffs cannot establish the fourth prong of the circumstantial evidence test. Weller did as the FDLE allowed after photographs were taken. And the ECSO did nothing to suggest an intent or design to alter or lose the items in question, which it steadfastly maintains were not altered or lost. In short, neither the evidence, nor any reasonable inference drawn from the evidence, suggests a conspiracy or plan to deprive Plaintiffs of access to the items at issue.

Although I cannot find bad faith, I do not, through this Report and Recommendation, condone the actions of Weller and the ECSO in failing initially to secure the items. Such action would have avoided all cause for doubt. Plaintiffs, however, are not without remedy. At trial, Plaintiffs should have broad latitude to bring out the factual matters advanced in support of the present motion. They should have the opportunity to introduce evidence regarding Defendants' handling of the items and even to suggest, subject to the discretion of the court, that Defendants failed to secure the items and, instead, allowed Deputy Weller to take them home and use them for several months. Counsel might also be given latitude to argue (although without benefit of an instruction) that the jury may draw adverse inferences from Defendants' handling of the items. *See id.* at 1334. As I suggested at the hearing, had Mr. Young survived and been charged with aggravated battery on a law enforcement officer, one would struggle to envision a scenario in which the

ECSO did not impound the pants, cell phone, and cell phone case as evidence of the alleged attack.

ACCORDINGLY, it is respectfully recommended that the Spoliation Motion (ECF No. 35) be DENIED as set out herein.

At Pensacola, Florida, this 6th day of December 2021.

*/s/ Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation. Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control. An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.** *See* **11th Cir. Rule 3-1; 28 U.S.C. § 636.**